IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**WILLIAM DAVIS and W.M.D.**
**CONSULTING, LLC**,

No: 3:13-cv-02119-MO

        Plaintiffs,

OPINION AND ORDER

   v.

**CASCADE TANKS LLC, CASCADE**
**COMPANIES LLC, BALUSA HOLDINGS,**
**INC., MACGRECOV INVESTMENTS**
**LIMITED, TRITORIA INVESTMENTS**
**LIMITED, and PIETER VAN DER STAAL**,

Defendants.


**MOSMAN, J.**,

      This is a suit for breach of fiduciary duty, minority shareholder oppression, intentional

interference with economic relations, and for an accounting.  (Complaint [1-1].)  Suit was

brought by Plaintiffs William Davis ("Mr. Davis") and W.M.D. Consulting, LLC ("WMD")

against Cascade Tanks, LLC ("Cascade Tanks"), various other entities in the corporate group of

which Cascade Tanks is a part, and various individuals who were officers or directors of these

entities during the relevant time.  The suit was filed in Multnomah County Court on March 1,

1 – OPINION AND ORDER

2013, and was removed to this Court on November 27, 2013, under the Convention on the

Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517,

codified at 9 U.S.C. § 201–208 (the "Convention").  Plaintiffs filed a motion to remand [14] and

Defendants filed a motion for stay pending arbitration [55, 57-1].

As explained on the record [69] and set out in my prior order [74], I DENIED the motion

for remand, finding that this Court has jurisdiction to determine the enforceability of the

arbitration agreement.  Turning to the motion for stay, I concluded that the arbitration agreement

at issue is enforceable under the Convention, and therefore stayed the case pending arbitration.

(Order [74].)  I now formally explain my rulings.

## BACKGROUND

### I. <u>Corporate Structure of the Parties</u>

The parties have submitted evidentiary support for their respective motions.  According

to this evidence and the Complaint [1-1], the facts in which I take as true, the basic structure of

the corporate group is as follows: Mr. Davis is the sole member of WMD.  WMD owns twenty

five percent of the shares of Defendant Macgrecov Investments, Ltd., ("Macgrecov"), a Cyprus

corporation.  *See* Armstrong Decl. [17] Ex. 3.  The other seventy five percent of Macgrecov is

owned by Defendant Tritoria LLC, a Cyprus LLC, and Trio Group Investments, a Bahamas

entity.  *Id.*  These two entities are allegedly controlled by a combination of Defendant Mr. van

der Staal and other individuals, dubbed "the Norwegian Investors" by Plaintiffs.  (Pl.'s Mem. in

Supp. Mot. to Remand [15] at 3.)

Macgrecov holds all shares in Defendant Balusa Holdings, Inc., a Nevada corporation,

which in turn wholly owns Defendant Cascade Tanks.  *See* Armstrong Decl. [17] Ex. 3.  Cascade

Tanks is an oilfield fluid handling supply and service business.  (Davis Decl. [17-2] ¶ 4.)

Defendant Cascade Companies LLC is a now-dissolved corporation that was once the parent company of Cascade Tanks. (Armstrong Decl. [17] Ex. 3.)

Mr. Davis was General Manager of Cascade Tanks until his termination on February 15, 2013. (Compl. [1-1] ¶ 31; Davis Decl. [17-2] ¶ 4–5.) He was paid a significant salary, and ownership shares in Cascade Tanks were also part of his compensation. (Compl. [1-1] ¶¶ 16, 19–20, 23–24.) His employment was governed by an Employment Agreement that is not at issue in this suit. (Compl. [1-1] ¶ 22; Armstrong Decl. [17] Ex. 7.) In this case, he brought suit in his capacity as a minority shareholder of Defendants Balusa and/or Macgrecov, interests which he holds through WMD. (Compl. [1-1] ¶¶ 1–31, 69.)

It is alleged that during the restructuring that ultimately resulted in the corporate structure described above, Mr. Davis signed, on behalf of WMD, a Stock Buy-Sell Agreement related to Balusa Holdings. (Compl. [1-1] ¶ 23; Armstrong Decl. [17] Ex. 6.) This agreement provided for binding arbitration in Nevada. (Armstrong Decl. [17] Ex. 6 at 18–19.) Before signing this agreement, Mr. Davis consulted with his attorney. (Davis Decl. [17-2] ¶ 13.) It is Mr. Davis's position that this agreement took effect and WMD thereby held shares in Balusa throughout 2011 and 2012. (Pl.'s Mem. [15] at 5.)

Defendants contend that the Balusa Agreement never took effect. Their position is that after the Balusa Agreement was signed but before it was put into effect, (and thus before WMD took ownership of any Balusa shares), it was determined that elements of the corporate structure should be moved offshore for tax reasons. Thus, Defendant Macgrecov, later made the parent company of Balusa, was purchased. Defendants submit evidence supporting the inference that WMD quitclaimed any interest in Balusa. (Dueck Decl. [30] Ex. 1.) Mr. Davis then signed a

new agreement, the Macgrecov Stock Buy-Sell Agreement (the "Macgrecov Agreement"), on its

behalf.  (Compl. [1-1] ¶ 25; Not. of Removal [1-1] Ex. B.)

In proposing that the Macgrecov Agreement replace the Balusa Agreement, Defendant

Mr. van der Staal explained to Mr. Davis in an email that the new agreement was essentially the

same as the former, except for two changes: "1. It shifts the competent court to [C]yprus, to

ensure that the entire jurisdiction is offshore: and, 2. The references to 'Balusa' are replaced with

'Macgrecov.'"  (Armstrong Decl. [17] Ex. 11 at 1.)  The email containing these representations

was sent on January 3, 2012.  *Id.* at 1.  A subsequent email, sent January 24, 2014, reiterated that

"the document we sent you is the same as the one you previously signed, with only one

significant change—namely that the agreement is subject to Cyprus law."  *Id.* at 2.

Mr. Davis declares that he received the documents in August 2012, but "did not sign all

of the documents until December 2012 because [he] wanted more information about the

transaction."  (Davis Decl. [17-2] ¶ 29.)  However, he also declares that he "did not ask [his]

lawyer to review the agreement" because he "relied on the representations . . . that the

Macgrecov agreement was 'the same deal' as the Balusa buy-sell agreement."  *Id.* ¶ 25.

## II.    <u>The Foreign Arbitration Agreement</u>

Defendants removed to this Court under the Convention on the grounds that the lawsuit

relates to a foreign arbitration agreement found in the Macgrecov Agreement.  (Not. of Removal

[1] ¶ 2.)  The Macgrecov Agreement's arbitration clause reads as follows:

> 10.15 Arbitration. Except as otherwise provided herein, any
> dispute or controversy arising  out of or relating to this Agreement
> (including its execution or the construction or enforcement of its
> terms) shall be determined by arbitration with the competent courts
> of Cyprus Limassol who shall have jurisdiction to settle any
> disputes, which may arise out of or in connection with this
> Agreement and that accordingly any suit action or proceeding
> arising out of or in connection with the Agreement may be brought
> in such courts.

> Upon filing of an action, each party agrees to undertake good faith efforts to agree upon an arbitrator within thirty (30) days after the deadline for filing of the answer to the complaint in question. If, despite such good faith efforts, the parties are unable to agree upon an arbitrator, each party such submit to the court . . . a maximum of three (3) arbitrators who meet the foregoing conditions for consideration, and the court shall decide upon the arbitrator from the potential arbitrators submitted to the court. Each party to the Action shall be responsible equally for the arbitrator's fees. The decision of the arbitrator shall be final and binding upon all parties.

(Not. of Removal [1] Ex. B at 16.)

## III.   **The Underlying Claims**

Plaintiffs' claims are for breach of fiduciary duty, minority shareholder oppression, intentional interference with economic relations, and for an accounting.  (Complaint [1-1] ¶¶ 36–77.)  Among other things, Plaintiffs allege that a Mr. Dueck (one of the "Norwegian Investors," who has been dismissed as a defendant by the state court) and others authorized "suspect loan transactions" through which Balusa would borrow money from a nonprofit entity controlled by himself and other "Norwegian Investors" at high interest rates, thus transferring profits out of the Cascade Tanks corporate family.  (Pl.'s Mem. [15] at 5; Davis Decl. [17-2] ¶ 18.)  Another basis for the claims is that the "Norwegian Investors" caused an unspecified Defendant entity to enter into fraudulent "consulting" transactions, through which they paid other entities in which the "Norwegian Investors" have an interest for consulting services never actually performed.  (*See* Davis Decl. [17-2] ¶ 32.)  Mr. Davis argues that his interest in Cascade Tanks, held through Macgrecov and Plaintiff WMD, has been and is being devalued by Defendants' actions.

## LEGAL STANDARDS

The district courts have removal jurisdiction over any suit which "relates to" an arbitration agreement "falling under the Convention."  9 U.S.C. § 205.  "[W]henever an arbitration agreement falling under the Convention could conceivably affect the outcome of the

plaintiff's case, the agreement 'relates to' the plaintiff's suit." *Infuturia Global Ltd. v. Sequus Pharms, Inc.*, 631 F.3d 1133, 1138 (9th Cir. 2011) (emphasis omitted) (quoting *Beiser v. Weyler*, 284 F.3d 665, 669 (5th Cir. 2002)).

Federal courts recognize "the emphatic federal policy in favor of arbitral dispute resolution," a policy that "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985). The Supreme Court has explained that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

Although the Convention's implementing legislation is codified as part of the Federal Arbitration Act ("FAA"), its terms differ in some significant ways. *See* 9 U.S.C. § 208 ("Chapter 1 [of the FAA] applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States"). The Convention provides that "the court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall . . . refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed." Convention art. II(3), 21 U.S.T. 2517. In contrast, the FAA allows a party to resist arbitration on "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

## DISCUSSION

### I.    <u>Removal Jursidiction</u>

Plaintiffs contend that this court lacks removal jurisdiction because the arbitration clause is "unenforceable under the Convention based on traditional contract defenses under the common law of the United States." (Pl.'s Mem. [15] at 12.) Defendants argue that the jurisdictional

inquiry is more limited, and that the substantive enforceability of the arbitration agreement is relevant not to jurisdiction, but to whether the court should go on to enforce the agreement and stay the action in favor of arbitration.  (Def.'s Resp. [27] at 1.)  As explained on the record, I agree with Defendants' reading of the Convention's text and the case law interpreting it.

As with any removed case, the Court's first inquiry is whether there is a statutory grant of federal jurisdiction.  Here, Defendants' basis for removal is 9 U.S.C. § 205.  In order to determine whether 9 U.S.C. § 205 provides jurisdiction in this case, the Court must answer two questions: (1) whether there is an arbitration agreement (or award) that "fall[s] under the Convention," and (2) whether "the subject matter of an action or proceeding pending in a State court relates to" that arbitration agreement.  9 U.S.C § 205.  Only if removal is proper does the court turn to the merits of enforcement.

Plaintiffs argue that more is required.  I disagree—that the jurisdictional inquiry is separate from the merits of enforcement is required by the text of the Convention and the provisions in which it is implemented.  The Convention provides that a court, "when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed." Convention art. II(3), 21 U.S.T. 2517.  The text contemplates that only a court "seized of" the suit will turn to the question whether the arbitration clause shall be enforced.  As used in article II(3), the phrase "seized of" means that the court is "in possession of" the action.[1]  *See* 14 *Oxford English Dictionary* 896 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. 1989); *Black's Law Dictionary* 1524 (Rev. 4th ed. 1968).  As explained below, a federal court cannot be "seized of

_____

[1] In this sentence, "seized" is used in a past participial phrase modifying "court."

7 – OPINION AND ORDER

an action" under this provision in the absence of federal jurisdiction, which is granted in 9 U.S.C. §§ 203 and 205.

One commentator has observed that "[t]he Convention's text is drafted in broad terms, designed for application in a multitude of states and legal systems . . . the Convention imposes uniform international standards while leav[ing] a substantial role for national law and national courts to play in the arbitral process."[2]  Congress did not individually codify many of the Convention's provisions, which apply on their own terms under 9 U.S.C. § 201.[3]  In implementing the treaty, however, Congress did fill in U.S. law–specific gaps in the Convention's provisions.[4]  Naturally, the Convention itself does not specify jurisdictional requirements, as these would differ between the many signatory states.  *See Carolina Power & Light Co. v. Uranex*, 451 F. Supp. 1044, 1051–52 (N.D. Cal. 1977) (observing that the Convention was drafted to apply in "many very different legal systems").

The federal courts, being courts of limited jurisdiction, cannot properly hear a case without the consent of Congress.  Therefore, Congress granted the federal courts jurisdiction over actions or proceedings falling under the Convention.  *See* Pub. L. No. 91-368, 84 Stat. 692, 692–93 (July 31, 1970), codified at 9 U.S.C. §§ 203, 205.  The Convention itself must be interpreted in light of its implementing legislation.  *See* 9 U.S.C. § 201.  Further, elsewhere the necessity of jurisdiction before an agreement may be enforced is mentioned.  In 9 U.S.C. § 206,

---

[2] Gary B. Born, I *International Commercial Arbitration* 116 (2d ed. 2014) (internal quotation omitted).

[3] *See* Albert van den Berg, *The New York Arbitration Convention of 1958* 123 (1981) ("The uniform provisions [of the Convention] supersede the relevant provisions of municipal [local] law"); *c.f. Rogers*, 547 F.3d at 1157–58 (applying Article II(3)'s "null and void" defense, not set out in Chapter 2 of Title 9, United States Code, instead of the FAA's broader defenses provision); *Bautista*, 396 F.3d at 1301–02 (same); *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 449 (3d Cir. 2003) (applying Article II(2)'s requirement that the agreement be in writing).

[4] *See* van den Berg, *supra* n.3, at 123 (observing that the Convention "contains internationally uniform provisions, but it also leaves a number of matters to be determined under some municipal law").

Congress specified that "a court having jurisdiction under this chapter" can direct arbitration as provided in the agreement.  Pub. L. No. 91-368, 84 Stat. 693, codified at 9 U.S.C. § 206.  The mention of "a court having jurisdiction" makes plain that jurisdiction is a necessary precondition to enforcement. [5]

The mandatory nature of the Convention's text further disallows Plaintiffs' preferred reading.  *See McCreary Tire & Rubber Co. v. CEAT S.p.A.*, 501 F.2d 1032, 1037 (3d Cir. 1974) (concluding that "[t]here is nothing discretionary about article II(3) of the Convention.").  Article II(3) provides that a "court . . . seized of an action . . . *shall* . . . refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed."  Convention art. II(3), 21 U.S.T. 2517 (emphasis added).  Under our law, only a court with jurisdiction has the power to refer the parties to arbitration (or indeed to issue any orders in the case).  Because a court "seized of an action" under article II(3) is *required* to refer the parties to arbitration, it follows that a federal court "seized of" an action under that provision must have jurisdiction.  Reading the Convention to require a court without jurisdiction to refer parties to arbitration would lead to an absurd result.

As implemented, article II(3) must be read such that in the absence of jurisdiction the district court would not be "seized of" the action.  It is therefore appropriate to determine whether federal jurisdiction exists before turning to the question whether there is an allowable defense to enforcement; only a court "seized of" a suit related to an arbitration clause covered by

---

[5] The term "seized of" has been used in other contexts to describe that a court has jurisdiction. *See Rosado v. Wyman*, 397 U.S. 397, 403 (1970) (using the term "seised of jurisdiction" to describe a district court's exercise of federal question jurisdiction); *Swift & Co. Packers v. Compania Columbiana Del Caribe, S.A.*, 339 U.S. 684, 694 (1950) (discussing whether a court sitting in admiralty is "seized of jurisdiction to correct a fraud"); *F.C.C. v. Assoc. Broadcasters*, 311 U.S. 132, 135 (1940) (considering whether the court below was "seized of jurisdiction"); *Hallstrom v. Tillamook Cnty.*, 844 F.2d 598, 601 (9th Cir. 1987) (noting that the federal courts' pendant jurisdiction over state law claims can exist only "if the court has previously properly been seized of jurisdiction") (internal quotation omitted).

the Convention can turn to the question whether the arbitration clause shall be enforced, and only a court with jurisdiction may be seized of the suit. Only once jurisdiction is determined is the court to turn to the enforceability of the arbitration agreement, a question which requires it to consider whether the agreement is "null and void, inoperative or incapable of being performed." Convention art. II(3), 21 U.S.T. 2517; *see also Jain v. de Mere*, 51 F.3d 686, 691 (7th Cir. 1995) ("Given that the court is properly seized of this action, it should not then be left helpless to enforce the arbitration agreement."); Restatement (Third) of Foreign Rel. L. of the U.S. § 487 cmt. e (1987) (explaining that "a court having jurisdiction of an action concerning a controversy with respect to which an agreement to arbitrate is in effect (i) must, at the request of any party, stay or dismiss the action, pending arbitration; and (ii) may direct the parties to proceed to arbitration in accordance with the agreement").

### A.    *Does the Arbitration Agreement Fall Under the Convention?*

Removal under Section 205 is predicated on the relatedness of the subject matter of the suit to an arbitration agreement "fall[ing] under the Convention." 9 U.S.C. § 205. Whether an arbitration agreement "fall[s] under the Convention" is governed by 9 U.S.C. § 202 and the Convention itself. The federal courts have developed a four-factor inquiry used to determine whether the requirements of Section 202 and the Convention are satisfied. The court must determine (1) whether "there is an agreement in writing within the meaning of the Convention;" (2) whether "the agreement provides for arbitration in the territory of a signatory of the Convention;" (3) whether "the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial;" and (4) whether "a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states." *Balen v. Holland Am. Line, Inc.*, 583 F.3d 647, 654–55 (9th Cir. 2009) (quoting *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 n.7 (11th Cir. 2005)). If all four

questions are answered in the affirmative, the arbitration agreement "falls under [the Convention]." *Standard Bent Glass*, 333 F.3d at 448–49.

Other courts, including those relied upon by the Ninth Circuit in *Balen*, have specified that these four factors are jurisdictional and therefore only after they are satisfied is the court to consider the substantive enforceability of the agreement. *See Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 366–67 (4th Cir. 2012); *Bautista*, 396 F.3d at 1294–95;[6] *Standard Bent Glass*, 333 F.3d at 448–49; *Ledee v. Ceramiche Ragno*, 684 F.2d 184, 186–87 (1st Cir. 1982). The Fourth Circuit explains that "[w]hen these jurisdictional prerequisites have been satisfied, a district court is obliged to order arbitration 'unless it finds that the [arbitration] agreement is null and void, inoperative or incapable of being performed.'" *Aggarao*, 675 F.3d at 366 (alteration in original) (quoting the Convention Art. II(3), 21 U.S.T. 2517.[7]

The Ninth Circuit applied these factors in *Balen*, 583 F.3d at 654–55. Although in *Balen* the Ninth Circuit stated that courts "address" these factors "to determine whether to enforce an arbitration agreement under the Convention," *id.* at 654, the cases on which it relied actually applied the factors to the jurisdictional question whether the agreement is covered by the

---

[6] Plaintiff cites a case from the Southern District of Florida, *Ruiz v. Carnival Corp.*, 754 F. Supp. 2d 1328, 1330–31 (S.D. Fla. 2010), for the proposition that whether the agreement is "null and void" is part of the jurisdictional inquiry. In that case, the court cited *Bautista*, 396 F.3d at 1295 n.7, for the proposition that "[e]ven if these jurisdictional requirements are met, *removal* is improper if affirmative defenses such as 'fraud, mistake, duress, and waiver' render the arbitration agreement 'null and void.'" 754 F. Supp. 2d at 1330 (emphasis added). I read *Bautista* differently. In *Bautista*, the Eleventh Circuit explained that "[a] district court must order arbitration unless (1) the four jurisdictional prerequisites are not met, . . . or (2) one of the Convention's affirmative defenses applies." 396 F.3d at 1294–95. This makes clear that the court inquired separately into jurisdiction and enforcement. The *Bautista* court concluded that in that case "there [were] no impediments to the district court's jurisdiction to compel arbitration," and "[f]urthermore," that "the agreement to arbitrate [was] not null and void or incapable of being performed." *Id.* at 1303. Thus, to the extent the *Ruiz* court's reasoning conflated the two inquiries I reject it as inconsistent with *Bautista*.

[7] In *Aggarao*, jurisdiction was not predicated on the propriety of removal under Section 205, so the court did not need to address whether the subject matter of the suit was "related to" an agreement covered by the Convention. *See* 675 F.3d at 361.

Convention, not the substantive enforceability of the arbitration agreement, *see Bautista*, 396

F.3d at 1294–95; *Standard Bent Glass*, 333 F.3d at 448–49.  For this reason and the textual

reasons discussed above, I decline to interpret the Ninth Circuit's description of the factors'

purpose as other than jurisdictional.

Furthermore, the Ninth Circuit's reasoning is consistent with its sister circuits' framing of

the two (separate) inquiries.  The *Balen* court applied the factors in a portion of its opinion

dealing with whether the Convention applied to the arbitration agreement at issue, not whether it

was subject to contract defenses.[8]  583 F.3d at 654–55.  I therefore conclude that the four factors

applied in *Balen* pertain to the jurisdictional inquiry.

The first factor is whether "there is an agreement in writing within the meaning of the

Convention."  *Balen*, 583 F.3d at 654–55 (quoting *Bautista*, 396 F.3d at 1294 n.7). I find that

there is an agreement in writing within the meaning of the Convention, *i.e.* the Macgrecov

Agreement's arbitration clause.[9]

---

[8] The Ninth Circuit addressed the plaintiff's arguments for the unenforceability of the arbitration agreement separately, concluding that each was unavailing.  *See* 583 F.3d at at 653–54.  The *Balen* court was faced with jurisdictional arguments, but they were based on the domestic Federal Arbitration Act's provision exempting "contracts of employment of seamen," not the scope of 9 U.S.C. §§ 203 or 205.  *Id.* at 652–53. The court simply held that this exemption was not applicable to arbitration clauses covered by the Convention.  *Id.* (citing *Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1154 (9th Cir. 2008)). The FAA's exemption clause therefore did not affect whether the court had jurisdiction under Title 9, Chapter 2.

[9] In practicality the inquiry into whether the proffered arbitration clause falls under the Convention may occasionally implicate issues also relevant to the enforceability of the arbitration clause. Although I view the better approach to be to reserve full such consideration for the enforceability stage, I have taken into account whether any of Plaintiffs' arguments against enforcement could also impact jurisdiction at this stage.  (*See* Tr. [69] 49:3–21.)  This inquiry need not reach the full substance of the arguments regarding enforceability.  Only a prima facie showing of each factor pertinent to whether the arbitration agreement "fall[s] under the Convention" is required.  9 U.S.C. § 205.

In this case, Plaintiffs argue that Mr. Davis, on behalf of WMD, never actually signed the final version of the Macgrecov Agreement containing the arbitration clause.  As I explained on the record, this is essentially an argument that there was no meeting of the minds, and thus the contract containing the arbitration clause does not exist.  This is why I took into consideration whether Plaintiffs' argument that the Macgrecov Agreement was not final when Mr. Davis signed it.  For the reasons stated on the record, I

The final three factors are whether "the agreement provides for arbitration in the territory of a signatory of the Convention;" whether "the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial;" and whether "a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states." *Balen*, 583 F.3d at 654–55 (quoting *Bautista*, 396 F.3d at 1294 n.7). These factors are easily disposed of; indeed, Plaintiffs do not contest that they are satisfied. The agreement provides for arbitration in the territory of a signatory of the Convention, *i.e.*, Cyprus. the agreement arises out of a commercial relationship; and there are parties to the agreement, *i.e.*, the foreign entity Defendants and Mr. van der Staal, who are not American citizens. *See Balen*, 583 F.3d at 654–55.

Therefore, I find that the Macgrecov Agreement's arbitration clause "fall[s] under the Convention" as required by Section 205.

### B.    Is the Subject Matter of the Action "Related to" the Arbitration Agreement?

Once the court has determined that the agreement falls under the Convention, the inquiry into removal jurisdiction under Section 205 is quite limited. Removal is proper if the "subject matter of [the] action or proceeding pending in State court *relates to* an arbitration agreement or award falling under the Convention." 9 U.S.C. § 205 (emphasis added). "[W]henever an arbitration agreement falling under the Convention could conceivably affect the outcome of the plaintiff's case, the agreement 'relates to' the plaintiff's suit." *Infuturia*, 631 F.3d at 1137–38 (quoting *Beiser*, 284 F.3d at 669) (emphasis in original). In *Beiser*, the Fifth Circuit observed that "[w]hatever else the phrase 'relates to' conveys, it means at least as much as having a

---

found that Plaintiffs had failed to show any such fraud. (Tr. [69] at 50:6–51:6.) Plaintiffs did not rebut Defendants' showing that an arbitration agreement in writing exists within the meaning of the Convention. *See Balen*, 583 F.3d at 654.

possible effect on the outcome of an issue or decision."  284 F.3d at 669.  The Ninth Circuit

agreed, observing that "[t]he phrase 'relates to' is plainly broad."  *Infuturia*, 631 F.3d at 1138.

That the jurisdictional inquiry is separate from the ultimate enforceability of the

arbitration clause is emphasized in *Beiser*.  The *Beiser* court made clear that a foreign arbitration

agreement could conceivably affect a plaintiff's suit even if the plaintiff "cannot ultimately be

forced into arbitration."  *Beiser*, 284 F.3d at 669.  It is therefore clear that a suit may be

"relate[d] to an arbitration agreement . . . falling under the Convention" even if arbitration cannot

ultimately be required.  *Id.*; 9 U.S.C. § 205.

The Macgrecov Agreement's arbitration clause plainly relates to Mr. Davis and WMD's

suit, as the claims arise, at least in part, from ownership of equity in Macgrecov, a relationship

governed by the Macgrecov Agreement.  Because the agreement "falls under the Convention"

and the subject matter of the suit "relates to" the agreement, the court has jurisdiction under 9

U.S.C. § 205.

## II.     Enforcement of the Arbitration Clause

Having determined that the arbitration agreement is covered by the Convention and that

the subject matter of the suit is related to the FAA, I turn to Plaintiffs' defenses to enforcement.[10]

Article II(3) of the Convention requires the court to "refer the parties to arbitration" unless the

agreement is "null and void, inoperative or incapable of being enforced."

The enforceability of foreign arbitration clauses covered by the Convention is governed

by substantive federal arbitration law.  *See* 9 U.S.C. § 208.  If a party seeking to avoid arbitration

---

[10] Defendants Macgrecov and Tritoria asked that I stay judicial proceedings pending arbitration
under the terms of the Macgrecov Agreement.  Although they argued that interpretation of the Macgrecov
Agreement is to be done under Cypriot law under the terms of the Agreement, they provided no citations
to or argument on the law of Cyprus.  (Resp. [27] at 17.)  I therefore found that they had waived the
application of Cypriot law, and have applied the law of Oregon to interpretation of the contract and
Plaintiffs' defenses to enforcement.

challenges the arbitration clause itself, the court is to decide the question of enforceability; if a challenge is to the contract as a whole, it is to be resolved by the arbitrator.  *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 447–49 (2006); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967).  Thus, in general I am only to consider arguments that are specific to the arbitration provision itself, "separate and distinct from any challenge to the underlying contract."  *Teledyne, Inc. v. Kone Corp.*, 892 F.2d 1404, 1410 (9th Cir. 1989) (emphasis omitted).

However, the Ninth Circuit has established that when a party resisting arbitration seeks to show that the contract containing the arbitration clause is void, as opposed to voidable, it is proper for the district court to resolve the question notwithstanding that it is an attack on the contract as a whole.  In *Three Valleys Municipal Water District v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136 (9th Cir. 1991), the Ninth Circuit held that *Prima Paint*'s bar on such consideration is "limited to challenges seeking to avoid or rescind a contract—not to challenges going to the very existence of a contract that a party claims never to have agreed to."  925 F.2d at 1140 (emphasis omitted).  The Ninth Circuit reasoned that "a party who contests the making of a contract containing an arbitration provision cannot be compelled to arbitrate the threshold issue of the existence of an agreement to arbitrate."  *Id.* at 1140–41; s*ee also Stanford v. MemberWorks, Inc.*, 483 F.3d 956, 963 (9th Cir. 2007) (explaining *Three Valleys*'s relationship with the holding of *Prima Paint*).

The *Prima Paint* rule applies to all but one of Plaintiffs' arguments for unenforceability; the remaining argument is governed by the rule announced in *Three Valleys*.

### A.    *Plaintiffs' Fraud Defenses*

Plaintiffs contend that "the Norwegian Investors induced Davis's assent to the arbitration clause with both affirmative misrepresentation and misrepresentations by non-disclosure."  (Pl.'s

15 – OPINION AND ORDER

Mem. [15] at 13.)  Plaintiffs put forward two theories of fraud.  First, they argue that Defendants

falsely represented to Mr. Davis that the only differences between the Macgrecov Agreement and

the Balusa Agreement are that it "shifts the competent court to Cyprus, to ensure that the entire

jurisdiction is offshore," and changes the company name from Balusa to Macgrecov.  *Id.*

(emphasis omitted).  Plaintiffs contend that this misled them because it failed to mention that

there was an *arbitration* clause under Cypriot law in the Macgrecov Agreement.  Second,

Plaintiffs contend that Defendants changed the Macgrecov Agreement's terms after Mr. Davis

(on behalf of WMD) had signed it.  *Id.* at 23–24.

### 1.        Fraud in the Inducement Theory

Plaintiffs first theory is one of fraud in the inducement: Defendants misrepresented the

terms of the Macgrecov Agreement in order to coerce Mr. Davis to sign it.  Because fraud in the

inducement makes a contract voidable rather than void, I may consider this argument only if it

pertains to the arbitration clause itself.  *See Buckeye Check Cashing*, 546 U.S. at 447–49; *Prima*

*Paint*, 388 U.S. at 403–04.  Happily for Plaintiffs, it does: the alleged misrepresentations are

related to the arbitration clause specifically, and so consideration of this argument by this Court

is proper.

Plaintiffs argue that Mr. van der Staal affirmatively misrepresented the nature of the

Macgrecov Agreement's dispute resolution clause when he told Mr. Davis that the Macgrecov

Agreement was "identical" to the Balusa Agreement except that it changed the company names

and "shifts the competent *court* to [C]yprus." (Pl.'s Mem. [15] at 13 (emphasis and alteration in

original) (quoting Armstrong Decl. [17] Ex. 11 at 1).)  It is Plaintiffs' position that the reference

to "court" misled Davis, because "court" does not include arbitration.  *Id.*  They argue that "the

plain understanding of van der Staal's statement that the arbitration clause shifted the jurisdiction

to the competent court of Cyprus was that any dispute would be resolved by a judge or jury in

Cyprus, not by arbitration." *Id.* at 13–14.  Finally, Plaintiffs argue that van der Staal owed

fiduciary duties to Davis, a minority shareholder of Balusa, because he was an officer of Cascade

Tanks and Balusa, and that he therefore had a duty to explain the Macgrecov Agreement's

dispute resolution clause to Mr. Davis and failed to do so.  *Id.* at 14.

Defendants respond that Plaintiffs' theory does not satisfy several elements of fraud in

the inducement.  The elements of fraud in Oregon are as follows: (1) a representation; (2) that is

false; (3) and is material; (4) the speaker's knowledge of falsity or ignorance of truth; (5) the

speaker's intent that the representation be acted on "by the person and in the manner reasonably

contemplated;" (6) the hearer's ignorance of the statement's falsity; (7) the hearer's reliance on

its truth; (8) the hearer's right to rely; and (9) the hearer's injury caused thereby.  *Conzelmann v.*

*Northwest Poultry & Dairy Products Co.*, 190 Or. 332, 350, 225 P.2d 757, 764–765 (1950); *see*

*also* Restatement (Second) of Contracts § 162 (1981).  Defendants contend that Plaintiffs' theory

fails to show that the statements made by Mr. van der Staal were false, fails to show any intent to

induce Mr. Davis to rely on the statements, fails to show that Plaintiffs actually relied on their

misunderstanding of the Agreement in entering into it, and fails to show that the alleged reliance

on Mr. van der Staal's statements was reasonable.

As explained on the record, I agree that the allegedly fraudulent statements were not

false.  The Balusa Agreement, which Plaintiffs signed after consulting counsel, provides for

binding arbitration in Nevada under the oversight of a Nevada court and is governed by Nevada

law.  The Macgrecov Agreement changed the dispute resolution provision so that the contract

provided for arbitration in Cyprus under Cypriot law.  That the competent court was changed

from Nevada to Cyprus is simply not false.  More importantly, the fact of binding arbitration

remained constant between the two Agreements.  Mr. van der Staal's description of the changes

from the Balusa Agreement in the Macgrecov Agreement would not be expected to include the fact that arbitration was now required, as this was not a change.

Defendants next contend that Plaintiffs can only show fraud in the inducement by proving that Mr. Davis was induced to sign the Macgrecov Agreement in reliance on a statement that the Macgrecov provided for resolution of disputes in a *court* in Cyprus, not by arbitration in Cyprus. As I explained on the record, I find that this showing has not been made. Plaintiffs did not put forward evidence sufficient to show that Defendants intended Mr. Davis to rely on his misunderstanding of the Macgrecov Agreement's arbitration clause in signing it.[11]

Finally, Defendants argue that Mr. Davis could not reasonably rely on Mr. van der Staal's statements without reading the contract itself. (Def.'s Resp. [27] at 22.) As explained on the record, I agree with Defendants. A showing of fraud requires that the party claiming reliance show that it was reasonable for him to rely. *See Oregon PERB v. Simat, Helliesen & Eichner*, 191 Or. App. 408, 428, 83 P.3d 350, 362 (2004); Restatement (Second) of Contracts § 162(2)). Mr. Davis and WMD could not reasonably rely on the proffered understanding of Mr. van der Staal's statements because this understanding contradicted the plain terms of the Macgrecov Agreement. Had Mr. Davis even skimmed the contract, he would have seen that it provided for arbitration.

--------

[11] Plaintiffs' contention is that Defendants pressured Mr. Davis into signing the agreement quickly in order to effectuate the transfer of ownership to Macgrecov. First, I find this factual showing insufficient. In light of Mr. Davis's admission that he had the agreement for several months before signing it and that Mr. van der Staal actually mentioned Mr. Davis's consulting with counsel, *see* Armstrong Decl. [17] Ex. 11 at 3, I find that Mr. Davis simply was not pressured into signing the agreement without reading it or fully understanding it. Even if there were such a showing, however, I would find it irrelevant because it shows only inducement to sign the Macgrecov Agreement as a whole, not inducement to sign the arbitration clause specifically. Whether the contract as a whole was induced by fraud is a question for the arbitrator.

Moreover, I find that even if Defendants owe fiduciary duties to Plaintiffs, Defendants breached no duty to explain the meaning of the Macgrecov Agreement to Mr. Davis and WMD. Mr. Davis represented that he was consulting counsel about the Macgrecov Agreement as he had done with the Balusa Agreement, and he was given ample time to consider its terms. Defendants and their officers could reasonably believe that he would do so and that he signed the agreement with full understanding.

### 2.    Fraud in the Factum Theory

Plaintiffs also argues that Mr. Davis never signed the final version of the Macgrecov Agreement: "[t]he document that defendants hold out as an enforceable arbitration agreement is the result of continued editing and discussions amongst the Norwegian Investors after the time that Davis[ ] purportedly signed the agreement." (Pl.'s Mem. [15] at 15.) As explained on the record, I read this argument as fraud in fact because it challenges whether Mr. Davis ever signed the document purported to be the Macgrecov Agreement at all.

Because this argument challenged the very existence of the Macgrecov Agreement, it is proper under Ninth Circuit precedent to address it, notwithstanding that it is not specific to the arbitration clause. *See Three Valleys*, 925 F.2d at 1140 (holding that the court may address challenges going to "the very existence of a contract that a party claims never to have agreed to").

Here, Plaintiffs' contention is that Mr. Davis never signed the final Macrecov Agreement. For the reasons stated on the record, I find that Plaintiffs have failed to make a showing sufficient to show such fraud. There is no evidence that what Mr. Davis signed was, in actuality, different than the contract submitted by the parties in this Court. Moreover, Plaintiffs themselves submitted the Macgrecov Agreement along with their complaint, alleging that it is the one signed by Mr. Davis on behalf of WMD. (Not. of Removal [1-1] Ex. B.) Plaintiffs' own reliance on the

existence of the Macgrecov Agreement, in combination with their failure of proof regarding whether the Agreement was changed after Mr. Davis signed the signature pages, belies their argument that the Macgrecov Agreement was never signed.

**B.      *Plaintiffs' Waiver Defense***

Under federal arbitration law, waiver is found where the party seeking to enforce an arbitration clause is shown to have been aware of an "existing right to compel arbitration," took actions inconsistent with that right, and thereby caused prejudice to the party opposing arbitration. *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 720–21 (9th Cir. 2012) (*citing Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986)).  "[A]ny party arguing waiver of arbitration bears a heavy burden of proof."  *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 758 (9th Cir. 1988) (internal quotation omitted).  Although participation in litigation can result in a finding of waiver, *c.f. Hoffman Constr. Co. of Or. v. Active Erectors & Installers, Inc.*, 969 F.2d 796, 798–99 (9th Cir. 1992), the necessary showing of prejudice is unlikely to be satisfied where litigation has not progressed beyond the pleading stages, *United Computer Sys.*, 298 F.3d at 765.

Plaintiffs argue that Defendants have waived their right to compel arbitration by litigating jurisdiction in state court before removal and by bringing a separate action in Nevada that involves Mr. Davis's employment contract.[12]  Rather than "promptly moving to compel arbitration," Plaintiffs argue, Defendants did not seek arbitration until "after they lost an important discovery motion."  (Pl's Mem. [15] at 34.)  Defendants point out that the "important discovery motion" pertained to jurisdictional discovery regarding the foreign Defendants' challenge to the court's personal jurisdiction.  (Def.'s Resp. [27] at 31.)  They argue that they

---

[12] This action is pending as Case No. 13-689221 in the District Court for Clark County, Nevada.

cannot be considered to have acted inconsistently with their right to compel arbitration simply by contesting personal jurisdiction, the lack of which they have a right to raise. As explained on the record, I agree with Defendants. I hold that a party does not act inconsistently with its right to compel arbitration of claims brought against it by contesting whether it may be haled into court in the first place, even if relatively extensive litigation of the jurisdictional issue is required as a result.[13] *See United Computer Sys.*, 298 F.3d at 765.

I also find that the foreign entities who seek to invoke the arbitration clause in the Macgrecov Agreement cannot be said to have waived their right to arbitration based on the Nevada litigation that is taking place between many of the same parties. Plaintiffs have made no factual showing that the foreign Defendants have participated in the Nevada claims (which arise from Mr. Davis's employment agreement, not ownership of the companies). That counterclaims exist in that case that are parallel to those at issue here does not result in waiver: Plaintiffs here brought those counterclaims, and Plaintiffs' actions cannot be used to show waiver by any defendant. Thus, I find that the foreign Defendants have not waived their right to compel arbitration under the Macgrecov Agreement by acting inconsistently with that right in the Nevada action. They simply have not participated in that action at all.

### C.    *Plaintiffs' Unconscionability Defense*

Finally, Plaintiffs urged this Court to find the Macgrecov Agreement's arbitration clause unenforceable by reason of unconscionability. Defendants argue that unconscionability, while

---

[13] The same might not be true if the argument for a lack of personal jurisdiction were groundless or frivolous. That is not the case here, and I need not decide whether a contest to personal jurisdiction that is without basis in law or fact could result in waiver. It is enough to observe that a supportable contest to the court's personal jurisdiction, such as the foreign Defendants raised in the state court, does not result in waiver.

available as a defense under the domestic FAA, is not available under the Convention; and that even if the defense is available, the dispute resolution clause is not unconscionable.

### 1.    Availability of Unconscionability as a Defense to Enforcement

The Convention's defenses to enforcement are limited to arguments that the foreign arbitration clause is "null and void, inoperative or incapable of being performed."  Convention Art. II(3), 21 U.S.T. 2517.  In contrast, the domestic FAA allows a party to contest arbitration "on such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2. Defendants contend that unconscionability, while available as a defense to enforcement under the broad provision of the FAA, is simply not included in the Convention's narrow list of defenses.

Although the Ninth Circuit has not addressed the scope of the Convention's defenses, other courts have done so.  Other courts have concluded that the Convention's "null and void" clause allows only such defense as "can be applied neutrally on an international scale."  *Ledee*, 684 F.2d at 187 (internal citation omitted).  In *Ledee*, the court reasoned as follows:

> The parochial interests of . . . [a] state[ ] cannot be the measure of how the "null and void" clause is interpreted.  Indeed, by acceding to and implementing the treaty, the federal government has insisted that not even the parochial interests of the nation may be the measure of interpretation.

*Id.* (internal quotation omitted).  Fraud, mistake, duress, and waiver have been recognized as properly applicable under the Convention.[14]  *Id.*

In *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985), the Supreme Court recognized that the Convention does not directly parallel the FAA.  At issue was

---

[14] As I noted on the record, "null and void" could be read to encompass only defenses showing that the contract is void, and not merely voidable.  (Tr. [69] at 53:22–54:14)  However, the provision has long been held to include defenses rendering the agreement merely voidable, such as fraud in the inducement, waiver, and duress.  Therefore, this narrow reading would be inconsistent with precedent.

whether a foreign arbitration agreement could be enforced so as to require arbitration of antitrust claims brought under the Sherman Act. 473 U.S. at 620–24. The Court rejected lower courts' conclusion that "the pervasive public interest in enforcement of the antitrust laws" justified non-enforcement of an otherwise applicable foreign arbitration agreement. *Id.* at 629 (internal quotation omitted). "[C]oncerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes," the Court concluded, "require that we enforce the parties' agreement, even assuming that a contrary result would be forthcoming in a domestic context." *Id.* Enforcement of foreign arbitration agreements under the Convention does not directly parallel enforcement of domestic arbitration agreements under the FAA.[15]

The Fifth Circuit has concluded that "state-law principles of unconscionability" are not defenses to enforcement under the Convention, reasoning that the Convention allows only such defenses as can be applied in all signatory countries under a "precise, universal definition." *Bautista*, 396 F.3d at 1302. The Ninth Circuit has not had occasion to decide whether unconscionability is available. In *Rogers*, 547 F.3d at 1158, the court assumed without deciding that unconscionability was available as a defense, but concluded that unconscionability had not been shown.

Unconscionability is an inherently equitable defense implicating the fine details of state public policy. As the Supreme Court has recognized, "the principal purpose underlying American adoption and implementation of [the Convention] was to encourage the recognition

---

[15] It has been recognized that the "null and void" inquiry, relevant to the agreement-enforcement stage, is separate from any public policy defense that might be raised at the award-enforcement stage. *See Aggarao*, 675 F.3d at 372–73; *see also* Restatement (Third) of Foreign Rel. L. of the U.S. § 488(2)(b) & reporter's note 2. In *Mitsubishi*, the Court recognized that at the award-enforcement stage the court would consider whether enforcement of the arbitration award would be "contrary to the public policy" of the United States. 473 U.S. at 637–38.

23 – OPINION AND ORDER

and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culber Co.*, 417 U.S. 506, 520 n.15 (1974); *see also* Born, *supra* n.2, at 105–07.  An unconscionability defense is a poor fit for the Convention's policy of unified standards for the enforcement of arbitration agreements and awards.  To subject agreements to defenses that turn on the particular public policy of the signatory nation (or state) would create harmful uncertainty for parties seeking to use arbitration agreements to facilitate international transactions. *See Mitsubishi*, 473 U.S. at 620–24; *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 8–9 (1972) ("The expansion of American business and industry will hardly be encouraged if, notwithstanding solemn contracts, we insist on a parochial concept that all disputes must be resolved under our laws and in our courts. . . . We cannot have trade and commerce in world markets and international waters exclusively on our terms").

Were it necessary to determine whether unconscionability is available as a defense to enforcement of an arbitration agreement under the Convention, I would conclude that it is not. Like the *Rogers* court, however, I need not decide whether unconscionability is available as a defense to enforcement of a foreign arbitration agreement covered by the Convention.  Even if that defense is available, the Macgrecov Agreement's arbitration clause is not barred thereby.

## 2.    Unconscionability Arguments

Under Oregon law, the test for unconscionability "has both procedural and substantive components," but the party asserting unconscionability need not show procedural unconscionability if the contract is shown to be substantively unconscionable. *See Hatkoff v. Portland Adventist Med. Center*, 252 Or. App. 210, 217–18, 287 P.3d 1113, 1118 (2012) (internal quotation omitted); *Vasquez-Lopez v. Beneficial Oregon, Inc.*, 210 Or. App. 553, 567,

152 P.3d 940, 948 (2007) (observing that "only substantive unconscionability is absolutely

necessary").  The doctrine of unconscionability has been explained as follows:

> Procedural unconscionability refers to the conditions of contract
> formation and involves a focus on two factors: oppression and
> surprise. Oppression exists when there is inequality in bargaining
> power between the parties, resulting in no real opportunity to
> negotiate the terms of the contract and the absence of meaningful
> choice. Surprise involves the question whether the allegedly
> unconscionable terms were hidden from the party seeking to avoid
> them.
>
> "Substantive unconscionability" generally refers to the terms of the
> contract, rather than the circumstances of formation, and the
> inquiry focuses on whether the substantive terms unfairly favor the
> party with greater bargaining power.

*Livingston v. Metro. Pediatrics, LLC*, 234 Or. App. 137, 151, 227 P.3d 796, 806 (2010).  The

Restatement (Second) of Contracts explains unconscionability in similar terms: "Relevant factors

include weaknesses in the contracting process like those involved in more specific rules as to

contractual capacity, fraud, and other invalidating causes; the policy also overlaps with rules

which render particular bargains or terms unenforceable on grounds of public policy."

Restatement (Second) of Contracts § 208 cmt. a.  Plaintiffs argue that the Macgrecov

Agreement's arbitration clause is both procedurally and substantively unconscionable.

      First, it is worth explaining that this is not a case involving a consumer transaction or

contract of employment.  (Tr. [69] at 54:25–55:24.)  Plaintiffs argue that this case is "more

analogous to cases involving employment relationships than sophisticated business dealings"

because Mr. Davis "was foremost an employee who was presented with an agreement by his

employer to obtain a substantial portion of his compensation."  (Pl.'s Reply [48] at 15.)  They

rely heavily on *Twilleager v. RDO Vermeer*, LLC, No. 10-1167, 2011 WL 1637469 (D. Or. Apr.

1, 2011), in which the court found an arbitration agreement unconscionable where it required an

employee service technician to travel from Oregon to North Dakota to arbitrate disability

discrimination and Family and Medical Leave Act claims. 2011 WL 1637469 at *9.  Although I

have taken into account that equity in Defendant Cascade Tanks was part of Mr. Davis's

employment compensation, Mr. Davis is not similarly situated to the service technician in

*Twilleager*, and neither are the claims at issue in this case similar to the federal statutory rights at

issue in that case.  I consider cases involving wage and hour employees to be largely inapplicable

here.  Furthermore, arbitration agreements between employer and employee are considered

conscionable where the employee is given ample time to review the agreement and has the

education to understand it.  *See Livingston*, 234 Or. App. at 152, 227 P.3d at 806 (contract

between doctor and medical group was not a contract of adhesion where doctor, "who is highly

educated, had an opportunity to review the employment agreement for two weeks, and he signed

and returned it without making any changes").  Here, although Defendants do not contest that

Mr. Davis is not as highly educated as the plaintiff in *Livingston*, it is apparent that he has

sufficient business sophistication to run the on-the-ground operations of a large company, and,

more importantly, had access to counsel and months in which to review the agreement.[16]

Although it is uncontested that the shares in Macgrecov were intended to be part of Mr.

Davis's compensation, he also failed to show that the Macgrecov Agreement, with both its

upsides and its downsides, was not bargained for.  The unconscionability inquiry looks to the

terms of the contract at the time it was signed, not the parties' positions once a conflict has arisen

later.  *See W.L. May Co., Inc. v. Philco-Ford Corp.*, 273 Or. 701, 707–08, 543 P.2d 283, 287

(1975).  Taking one's compensation in the form of equity has the potential for significant

---

[16] Plaintiffs make much of the fact that Mr. Davis's formal education continued only to the eighth
grade.  While this fact is not irrelevant, it does not negate that Mr. Davis has developed significant
expertise in the relevant industry and was apparently a highly valued management-level employee of
Cascade Tanks.  Most importantly, because he had access to counsel and time to consult, any detriment
caused by his lack of formal education could and should have been ameliorated.

benefits as well as increased risks, of which Mr. Davis was surely aware at the time of contract

formation.  Mr. Davis has not shown that he was unaware of these risks and benefits.

Finally, the claims at issue in Plaintiffs' case against these Defendants arise from WMD's

status as a shareholder in Defendant entities and from Mr. Davis's ownership of WMD.  Plaintiff

WMD is the entity that owns shares in Macgrecov, and WMD cannot be said to be an employee

of any Defendant.  Although Mr. Davis was an employee of Defendant Cascade Tanks, he signed

the Macgrecov Agreement in his capacity as owner of WMD, not in his capacity as an employee.

### a)    Procedural Unconscionability

Plaintiffs argue that the Agreement is procedurally unconscionable because "[t]he

Norwegian Investors used pressure and deception to obtain Davis's assent to the Macgrecov

Agreement." (Pl.'s Mem. [15] at 20.)  As explained above, I found that Plaintiff had shown no

such pressure and deception.  For the reasons stated on the record and above, I find that there

was nothing procedurally unconscionable about Plaintiffs' assent to the Macgrecov Agreement's

arbitration clause. Mr. Davis had several months' time in which to review the agreement before

he signed it, and had the opportunity to consult with counsel.  He had consulted with counsel

before signing the Balusa agreement, which provided for arbitration of any disputes in Nevada.

Evidence submitted by the parties shows that Mr. Davis was also given the opportunity to

negotiate the terms of the Macrecov Agreement.  *See* Armstrong Decl. [17] Ex. 11 at 1–3.  For

instance, in an email dated February 9, 2012, Mr. van der Staal specifically mentioned changing

a certain term of the Macgrecov Agreement if Mr. Davis's lawyer was concerned about the

meaning of the term as then drafted.  *Id.* at 3.

The record shows that Mr. Davis and WMD had the "opportunity to negotiate the terms

of the contract."  *Hatkoff*, 252 Or. App. at 217, 287 P.3d at 1118 (internal quotation omitted).

Mr. Davis's own decision not to carefully review the Macgrecov Agreement or to consult with counsel before signing it does not create procedural unconscionability; that a party with bargaining power fails to exercise that power does not create unconscionability in contract formation.  Plaintiffs have also failed to show any surprise.  The plain text of the Macgrecov Agreement provided for arbitration in Cyprus, and as Defendants point out, Mr. van der Staal's statements about the similarities between it and the Balusa Agreement should have drawn Mr. Davis's attention to the dispute resolution provision, rather than hiding it.

> **b)**      **Substantive Unconscionability**

However, an arbitration clause may be unenforceable in Oregon even in the absence of procedural unconscionable if it is substantively unconscionable.  *Vasquez-Lopez*, 210 Or. App. at 566–67, 152 P.3d at 948.  "[I]n determining whether the substantive contract provisions of a commercial contract are unconscionable," Oregon courts "look to the circumstances existing at the time of the execution of the contract and examine the challenged provisions in the light of both the general commercial background and the special commercial needs of the particular trade involved."  *W.L. May*, 273 Or. at 708–09, 543 P.2d at 287; *see also Vasquez-Lopez*, 210 Or. App. at 556, 152 P.3d at 948 ("unconscionability is a question of law to be assessed on the basis of facts in existence at the time the contract was made").

Substantive unconscionability in Oregon is recognized where the terms of the arbitration agreement unreasonably favor the party with greater bargaining power.  *Hatkoff*, 252 Or. App. at 217, 287 P.3d at 1118.  Even assuming Defendants had greater bargaining power than did Plaintiffs, the terms of the agreement do not unreasonably favor them.  Naturally, there are some costs to arbitration that would not exist if the dispute were litigated, such as fees for the arbitrator and for facilities.   Because the Macgrecov Agreement governs the relationship between several

parties of various countries of citizenship and residence, there is no venue that would be convenient to all parties.[17]  The parties therefore could reasonably agree to arbitration in Cyprus, which is none of the individuals' home country but is the country of citizenship of Macgrecov, the parent company.

Although in the Macgrecov Agreement the site changed from Nevada to Cyprus, this change did not increase the anticipated costs of arbitration per se.  Rather, it added potential international travel costs and substituted the need for counsel familiar with Nevada law for counsel familiar with Cypriot law.  These potential costs, however, came with the tax benefits of offshore incorporation, of which Mr. Davis was surely aware.  In exchange for the future tax benefits of holding the companies offshore, he reasonably took the risk that, in the event of a dispute, arbitration could involve international travel.

## III.    <u>Stay and Severability</u>

Plaintiffs urged me to sever their claims against the domestic entity Defendants and allow them to proceed in state court even if I were to enforce the arbitration agreement as to the foreign Defendants.  I declined to do so, ordering that all claims be stayed for the pendency of the arbitration.  As pled, Plaintiffs' claims against the various defendants are indistinguishable from one another.  Therefore, parallel state court litigation would seriously interfere with the arbitration for which the parties to the Macgrecov Agreement contracted.  *See Moses H. Cone*, 460 U.S. at 20–21.  As I explained in my Order, the parties are free to avoid duplicative litigation

---

[17] Although this fact is primarily relevant to procedural unconscionability, I also note that Plaintiffs' own purported understanding of the Macgrecov Agreement would still require them to travel to Cyprus to litigate any disputes. It is difficult to see how the existence of the costs of international travel would have been a great burden to Mr. Davis at the time the agreement was signed, in light of Plaintiffs' concession that he understood at the time that dispute resolution under the Macgrecov Agreement would be overseas.

29 – OPINION AND ORDER

by agreement to a global arbitration of all claims, including those against Defendants who are not signatories to the Macgrecov Agreement.

## CONCLUSION

For the reasons explained above, the Motion to Remand is DENIED and the Motion for Stay Pending Arbitration is GRANTED.  All claims are STAYED pending arbitration under the terms of the Macgrecov agreement.

IT IS SO ORDERED.

DATED this   24th   day of July, 2014.

/s/ Michael W. Mosman        
MICHAEL W. MOSMAN
United States District Judge